Roger A. PODANY, for himself and all others similarly situated, Plaintiffs,

v.

ROBERTSON STEPHENS, INC., and Paul Johnson, Defendants.

Anthony V. Finazzo, for himself and all others similarly situated, Plaintiffs,

v.

Robertson Stephens, Inc., and Paul Johnson, Defendants.

Nos. 03 Civ. 3961(GEL), 03 Civ. 4018(GEL).

United States District Court, S.D. New York.

Feb. 17, 2004.

Joseph H. Weiss, Jack I. Zwick, Weiss & Yourman, New York, N.Y. (Kevin J. Yourman, Jordan L. Lurie, Leigh A. Parker, Weiss & Yourman, Los Angeles, CA), John Balestriere (for Finazzo plaintiffs only), Marc I. Gross, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY, and Jacqueline Sailer, Gregory B. Linkh, Rabin, Murray & Frank LLP, New York, NY, for Podany and Finazzo plaintiffs, of counsel.

Andrew J. Frackman, Jill G. Fieldstein, Brendan Dowd, O'Melveny & Myers LLP, New York, NY, for defendant Robertson Stephens, Inc.

Eric S. Goldstein, Matthew J. Gaul, Douglas M. Pravda, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for defendant Paul Johnson.

## OPINION AND ORDER

LYNCH, District Judge:

The above-captioned cases concern allegations that an equity analyst engaged in a scheme, with the knowledge of his employer broker-dealer, to commit securities fraud by publishing false statements of opinion about certain issuers in reports disseminated by the broker-dealer. The proposed plaintiff classes, composed of purchasers of the issuers' stock, argue that the defendant analyst opined positively about the effect of announced mergers on the issuers' stock, not because he truly believed that the mergers would have a beneficial effect on the issuers, but rather because he owned stock in the target companies and stood to gain enormous personal profits from the impending stock-swap mergers if the issuers' stock prices remained high.

The complaint alleges that the analyst, Paul Johnson, purchased shares in privately-held telecommunications start-up companies likely to become merger targets, with the intent of using his position as an equity analyst to fraudulently drum up demand for shares in the acquirer in order to receive a windfall when his stock in the target was converted into higher-valued acquirer stock. Plaintiffs argue that defendants never disclosed the analyst's interest in the target companies, and that defendants had no reasonable factual basis to issue positive reports about the issuers in light of what defendant knew or should

have known about the announced mergers. The larger context of the alleged fraud is the volatile market in telecommunications stock that existed in the late 1990s. More specifically, the context includes other, similar allegations against these defendants; this Court recently denied a motion to dismiss the somewhat similar claim that these defendants schemed to defraud purchasers of stock in the Corvis Corporation. *See DeMarco v. Robertson Stephens*, Dkt. No. 03 Civ. 590(GEL), 2004 WL 51232 (S.D.N.Y. Jan.9, 2004).

Plaintiffs are purchasers of the issuers' stock, and rely on a fraud-on-the-market theory to argue that defendants' false statements of opinion artificially inflated the issuers' share prices, and contributed to plaintiffs' losses. Defendants move to dismiss both complaints for failure to state claims upon which relief may be granted. The above-captioned cases are brought independently by separate plaintiffs, but because of the identity of the defendants, the similarity of the alleged schemes, and the similarity of legal issues raised, the Court will resolve both motions in this opinion. For the reasons that follow, the motions to dismiss shall be granted.

## BACKGROUND

For purposes of these motions to dismiss, the facts alleged in the complaints must be accepted as true.

During the period addressed in this complaint, defendant Robertson Stephens, Inc. ("Robertson Stephens" or "RS") was active as a broker-dealer that provided financial services including securities underwriting, investment banking and the publication of equity analysis. Defendant Paul Johnson was then an equity analyst at Robertson Stephens specializing in telecommunications and internet companies, and was described as "well-regarded and highly visible" in a Wall Street Journal

article in December 2001. (*Finazzo* Am. Compl. ¶ 28, *Podany* Am. Compl. ¶ 25.)

Robertson Stephens was in the business of publishing research reports authored by analysts like Johnson, which contained information about the rated issuer, analysis of the issuer's business, and purchase recommendations regarding the issuer's stock based on the analyst's opinion. Research reports drafted by Johnson or members of his staff were distributed to RS's institutional clients, and were available to RS's clients on its website. (*Finazzo* Am. Compl. ¶ 26.) The reports culminated in purchase recommendations that took the form of concise rating statements such as "buy," "strong buy" and "long term attractive," which were often "widely broadcast to the investing public free of charge" without the accompanying analysis. (*Podany* Am. Compl. ¶ 26.) These short rating recommendations were frequently picked up and disseminated by other media outlets such as Bloomberg News Service and websites like Yahoo!Finance or CBS MarketWatch. (*Id.*)

The analyst reports contained disclaimers stating that "Robertson Stephens, its managing directors, its affiliates, and/or its employees may have an interest in the securities of the issues described and may make purchases or sales while this report is in circulation." After September 26, 2000, the disclaimer stated that it applied to "the research analysts authoring this report." (*Finazzo* Am. Compl. ¶ 89.)

### Robertson Stephens Analyst Reports on Redback Networks, Inc.

The *Finazzo* complaint concerns RS analyst reports on Redback Networks, Inc. ("Redback"), a company whose products enable carriers, cable operators and internet service providers to manage large numbers of subscribers using high speed internet access. (*Finazzo* Am. Compl. ¶ 17.) Plaintiffs allege that defendants

knowingly issued false statements of opinion about the value of publicly-traded Redback stock in order to artificially prop up its stock price after Redback announced a merger with Siara Systems, Inc. ("Siara") a privately-held company engaged in the business of developing optical networking equipment. (*Id.* ¶ 35.) Plaintiffs allege that Johnson was motivated to publish false opinions because he owned stock in Siara, and would profit enormously by the merger if Redback's stock price remained high. Plaintiffs further allege that Robertson Stephens knew of the fraud, yet continued to publish the false statements of opinion without taking steps to monitor or correct them.

In January 1999, Johnson invested $50,000 of his own funds in Siara through a private placement, thus violating an internal Robertson Stephens rule requiring approval before investing in a private company. (*Id.* ¶ 36.) RS learned that Johnson owned undisclosed Siara stock in September 1999, yet failed to monitor Johnson's research reports accordingly. (*Id.* ¶ 100.) By March 1999, Johnson had become a member of a four-person technical advisory board at Siara that assisted the company in defining its products. He remained on that board up through the consummation of Siara's merger with Redback (*Id.* ¶¶ 38, 45.)

On May 18, 1999, Robertson Stephens co-managed the initial public offering ("IPO") of Redback stock. (*Id.* ¶ 39.) On June 14, 1999, Robertson Stephens issued its first report on Redback, culminating in a "buy" rating. (*Id.* ¶ 40.) That was followed by two more research reports, on July 23 and October 14, 1999, reiterating the buy recommendation. (*Id.* ¶¶ 41, 42.)

In late October 1999, an internal committee at Redback discussed possible merger targets, and at some point shortly thereafter Redback contacted Siara to discuss a possible combination. The companies negotiated a merger during November 1999. (*Id.* ¶ 43). On November 27, 1999, Siara accepted Redback's offer to acquire Siara at a purchase price of 38% of the post-merger company. On November 29, Redback announced that it would acquire Siara (a company with no products, no customers and no revenue, that had posted a half million dollar loss for the previous year), in exchange for Redback stock then valued at $4.3 billion. (*Id.* ¶¶ 44, 46.)

Robertson Stephens issued research reports on Redback touting the proposed acquisition of Siara on November 29 and 30, 1999, and recommending that investors buy Redback stock. (*Id.* ¶¶ 52, 54.) Redback's share price rose by 10% on November 29. (*Id.* ¶ 53.) Plaintiffs allege that the November 29 and 30 reports were false statements of opinion because they did not disclose Johnson's interest in Siara,[1] and because defendants had no reasonable basis to be positive about the merger because in actuality the merger was a risky financial proposition for Redback, since the price was very high for a target with no present assets, and since Siara would require a significant infusion of funding to develop its products. (*Id.* ¶¶ 47, 57.)

Robertson Stephens published another Redback research report with a buy rating on January 20, 2000, and issued a press release. (*Id.* ¶ 59.) When the acquisition was consummated on March 8, 2000, Redback stock closed at $327.69. The stock price had more than doubled from the day the merger was announced on November 29, 1999. (*Id.* ¶ 61.) As a result of the merger, Johnson received 30,069 shares of

---

**1.** Plaintiffs concede that the Form 8–K Redback filed with the SEC reporting the proposed acquisition did list Johnson as a Siara shareholder. (*Finazzo* Am. Compl. ¶ 58.)

Redback stock, worth approximately $9.9 million. (*Id.*) The complaint does not allege that Johnson ever sold the Redback stock he acquired through the merger.

Robertson Stephens continued to issue "buy" ratings for Redback stock post-merger. It published Redback reports on April 13, June 6, July 13, and October 13, 2000, all maintaining a "buy" rating. (*Id.* ¶¶ 62, 64, 66.) Plaintiffs allege that the opinions contained in these reports were false and misleading because defendants lacked a reasonable basis for the recommendations, and failed to disclose that Johnson acquired Redback stock in exchange for his Siara stock. (*Id.* ¶¶ 65, 68.) On January 10, 2000, Robertson Stephens upgraded Redback to a "strong buy" rating, and subsequently downgraded Redback to "buy" on January 18, 2000. (*Id.* ¶¶ 73, 78.) Robertson Stephens maintained the "buy" rating in reports and press releases issued on January 22, April 3, and April 12, 2001. (*Id.* ¶¶ 78, 82, 84.) RS never deviated downward from its "buy" rating, even when other analysts downgraded Redback.[2]

The *Finazzo* plaintiffs commenced this action on June 6, 2003, charging both defendants with violating § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder, and charging Robertson Stephens with violating § 20(a) of the Exchange Act. The consolidated amended complaint was filed on September 5, 2003. In sum, plaintiffs claim that RS reports on Redback issued on November 29 and 30, 1999 (*id.* ¶¶ 47, 57), April 13, June 6, July 13 and October 13, 2000 (*id.* ¶¶ 62, 64–66, 68), contained false statements of opinion because defendants lacked a reasonable basis for those opinions, and because defendants failed to disclose Johnson's own-

ership of Siara stock at the time of the March 8, 2000, merger.

*Robertson Stephens Analyst Reports on Sycamore Networks, Inc.*

The *Podany* plaintiffs allege that defendants published false statements of opinion in reports covering the stock of Sycamore Networks, Inc. ("Sycamore"), as part of a scheme similar to the one described above. In October 1999, Robertson Stephens underwrote the IPO for Sycamore, a company engaged in the production of optical communications systems for telecommunications networks. (*Podany* Am. Compl. ¶¶ 15, 36.) Robertson Stephens initiated its ratings coverage of Sycamore with a report authored by Johnson on November 16, 1999, with a "buy" recommendation. (*Id.* ¶ 36.) On January 10, 2000, Johnson purchased $75,000 worth of shares in Sirocco Systems, Inc., a privately-held company engaged in the production of devices that manage bandwidth within telecommunications networks. (*Id.* ¶¶ 37, 16.)

Almost five months later, on June 6, 2000, Sycamore announced a merger with Sirocco to take place in the following quarter, whereby all Sirocco stock would be exchanged for Sycamore stock worth approximately $2.9 billion. (*Id.* ¶ 38.) Plaintiffs allege that Johnson stood to gain almost $2 million in Sycamore stock when the merger was consummated, if Sycamore's price did not drop between the announcement date and the date of consummation. (*Id.* ¶ 42.) Johnson began touting the merger as soon as it occurred, both in the media and in an RS research report on Sycamore dated June 6, reiterating the "buy" rating. (*Id.* ¶¶ 43–44.) Robertson Stephens issued another positive report on Sycamore dated August 25, 2000, again repeating the buy rating. (*Id.* ¶ 47.)

---

**2.** Morgan Stanley downgraded Redback on November 20, 2000 (*id.* ¶ 72), and ABN–Amro

Bank and Dain Rauscher Wessels downgraded Redback on April 3, 2001 (*id.* ¶ 83).

During the summer of 2000, the price of Sycamore stock rose from the low $100 range to the $150 range, and when the stock-swap merger finally occurred on September 7, 2000, Johnson's Sirocco stock was converted into $2.3 million of Sycamore stock. (*Id.* ¶¶ 50–51.)

After the merger, the price of Sycamore stock declined. Robertson Stephens published reports reiterating its "buy" rating on November 15, 2000, February 14, 2001, and March 15, 2001, when the stock closed at $68.438, $26.313, and $12.188, respectively. (*Id.* ¶¶ 52, 53, 55.) After Sycamore announced a downward earnings adjustment on April 5, 2001, including a $130–140 million restructuring charge, RS published its April 6 report, downgrading Sycamore's rating to "Long Term Attractive." The stock closed that day at $7.25. (*Id.* ¶¶ 56, 58.) Apparently the stock price subsequently rose a bit, because plaintiffs allege that the publication of a New York Times article on May 27, 2001, caused the Sycamore price to drop from $11.01 to $10.23 between May 25 and May 29. (*Id.* ¶¶ 59–60.)

The *Podany* plaintiffs initiated this lawsuit on May 30, 2003, charging Johnson and RS with violating § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, and charging Robertson Stephens with control person liability under § 20(a) of the Exchange Act. The consolidated amended complaint was filed on September 5, 2003. In sum, plaintiffs claim that the RS reports on Sycamore issued on June 6, August 25, and November 15, 2000, and February 14, 2001 (*id.* ¶¶ 49, 54), contained false statements of opinion because defendants lacked a reasonable basis for their recommendations, and because Johnson failed to disclose his ownership of Sirocco stock at the time of the September 7, 2000, merger.

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

■ On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir. 1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Beyond the facts in the complaint, the Court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991). While the Federal Rules of Civil Procedure generally require only notice pleading, where, as here, plaintiff alleges fraud, "the circumstances constituting fraud . . . shall be stated with particularity." Fed.R.Civ.P. 9(b); *see Stern v. Gen. Elec. Co.,* 924 F.2d 472, 476 (2d Cir.1991) ("[A]llegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based."). "Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987).

### II. *Section 10(b) Claims*

#### A. *Legal Standard*

The Securities Exchange Act protects investors by proscribing,

in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Commission, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); *see SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 847–48 (2d Cir.1968) (explaining that the SEC "promulgated [Rule 10b–5] pursuant to the grant of authority given the SEC by Congress in Section 10(b) of the Securities Exchange Act of 1934," by which Congress sought "to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges").

### B. *Heightened Pleading Requirements*

■ For federal securities fraud claims, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, reinforces the heightened pleading standards that apply to all claims of fraud or mistake under Fed.R.Civ.P. 9(b). Under the PSLRA, complaints alleging securities fraud must, first, "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u–4(b)(1)(B); and second, "with respect to each act or omission alleged . . . ,

state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2); *see Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). That state of mind is scienter, which means "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also Kalnit*, 264 F.3d at 138 (same).

The Second Circuit has made clear, however, that the PSLRA " 'did not change the basic pleading standard for scienter in this circuit.' " *Id.*, quoting *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir.2000). Both before and after the PSLRA, the law required plaintiffs bringing claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, to allege scienter with particularity. *Id.; compare Novak*, 216 F.3d at 307 (emphasizing that securities fraud allegations must "give rise to a strong inference of fraudulent intent"), *with* 15 U.S.C. § 78u–4(b)(2) (codifying the PSLRA's requirement that securities fraud complaints "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]").

### C. *Misrepresentation of Opinion*

■ To state a cause of action under § 10(b) and Rule 10b–5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 161 (2d Cir.2000). *See In re WorldCom, Inc. Securities Litigation*, 294 F.Supp.2d 392 (S.D.N.Y.2003).

■ The sine qua non of a securities fraud claim based on false opinion is that defendants deliberately misrepresen-

ted a truly held opinion. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). In other words, plaintiffs must allege with particularity that defendants did not sincerely believe the opinion they purported to hold. As one judge of this court recently put it, "[p]laintiffs who charge that a statement of opinion ... is materially misleading, must 'allege with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." *Bond Opportunity Fund v. Unilab Corp.*, Dkt. No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), citing *Virginia Bankshares*, 501 U.S. at 1093–98, 111 S.Ct. 2749. It is not sufficient to allege, as plaintiffs have done in both cases addressed here, that it would have been possible to reach a different opinion than that reached by defendant based on information available to defendant at the time, or even that the defendant's opinion was unreasonable. A securities fraud action may not rest on allegations that amount to second-guesses of defendants' opinions about the future value of issuers' stock—second-guesses made all too easy with the benefit of hindsight.

While in a misstatement of fact case the falsity and scienter requirements present separate inquiries, in false statement of opinion cases such as these, the falsity and scienter requirements are essentially identical. That is because a material misstatement of *fact* is alleged by pointing to the true fact about the world that contradicts the misstatement. But even if the state-

ment of fact ("the company made × million dollars in profit last year") turns out to be objectively false, it could have been made in good faith; subjective intent to commit fraud is a wholly separate inquiry from whether the statement is objectively true. However, a material misstatement of *opinion* is by its nature a false statement, not about the objective world, but about the defendant's own belief. Essentially, proving the falsity of the statement "I believe this investment is sound" is the same as proving scienter, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion. As with all inquiries into someone's state of mind, plaintiffs must typically rely on circumstantial evidence for the defendants' words and actions.

For instance, the complaint in the related *DeMarco* case (involving defendants' ratings of Corvis stock) described acts and statements inconsistent with the defendants' published opinions about the value of Corvis stock. The *DeMarco* plaintiffs alleged that, at the very time that Johnson and Robertson Stephens advised the market to purchase Corvis stock, Johnson made specific statements to RS insiders, in effect asserting that Corvis stock was overvalued and should be sold. The inference of insincerity in that case was also supported by the additional allegation that while advising the market to buy Corvis stock, defendants sold their own Corvis stock at the earliest opportunity. That action was contrary to defendants' published advice, and supported the inference that the published opinion was fraudulent.[3]

---

3. Plaintiffs point out that there is no requirement under § 10(b) that defendants actually profit from the fraudulent scheme, so there is no requirement that Johnson have sold the allegedly overvalued stock he acquired as a result of the mergers. (Podany Opp. 18; Finazzo Opp. 17, n. 17.) They are correct. However, had Johnson sold his Redback or Sycamore stock shortly after receiving it, at a time when RS reports still advised the market to purchase such stock, that action would be powerful evidence that the "buy" recommendations were not sincerely held beliefs. The absence of an allegation that Johnson did so does not as a matter of law preclude plaintiffs' claims. It merely points up the absence

The plaintiffs in *DeMarco* thus alleged specific provable words and actions of defendants from which a reasonable factfinder could infer that the published "buy" recommendation was not merely bad advice, but a false statement of opinion, and that the defendants' truly held belief was that it was advisable to sell Corvis stock.

■ The *Finazzo* and *Podany* plaintiffs, by contrast, point to no inconsistent statements or actions by defendants from which a factfinder could infer that the published opinions were not truly held. In the absence of evidence of statements or actions inconsistent with the published opinions about Redback and Sycamore, the complaints in *Finazzo* and *Podany* offer three other kinds of evidence to support the allegation that defendants knowingly made false statements of opinion as part of a scheme to artificially inflate prices of those shares. First, plaintiffs present detailed facts about the proposed mergers, from which they argue that no reasonable analyst could have genuinely held positive opinions about the likely effects of the mergers on the acquiring companies. Second, they allege that Johnson's interest in the target companies was undisclosed, and that this conflict of interest shows that defendants had motive to publish false opinions. Finally, plaintiffs allege that the defendants engaged in similar fraudulent schemes concerning other issuers rated by Robertson Stephens, most particularly with respect to the RS reports on Corvis, in support of the conclusion that defendants' opinions about Redback and Sycamore were also false. For the reasons that follow, even taking all facts in the light most favorable to plaintiffs, as the Court must do on these motions to dismiss, the evidence asserted in the complaints does not meet the *Virginia Bankshares* standard requiring that fraudulent opinion

of one category of "provable fact" indicating

be alleged "with particularity" by way of "provable facts."

*Reasonableness of the Opinions*

In support of the allegation that the opinions were not genuinely held, the *Podany* and *Finazzo* complaints present detailed information about the proposed mergers. They ask the Court to put itself in the defendants' shoes and analyze the purchase-worthiness of the issuers' stock in light of that information, and to conclude that it would have been wiser to advise against the purchase of issuer stock because the proposed mergers were too risky for the acquiring companies. This is precisely the kind of second-guessing with the benefit of hindsight that *Virginia Bankshares* and its progeny counsel against. As another court in this Circuit has noted, although *Virginia Bankshares* did not directly address the question of whether a showing as to objective inaccuracy of an opinion is sufficient to state a claim, the logic of the decision indicates that both objective and subjective falsity is required. *See Freedman v. Value Health, Inc.*, 958 F.Supp. 745, 753 (D.Conn.1997). As the *Freedman* court observed, liability premised on objective wrongness of an opinion alone would risk holding federal securities law defendants liable for good-faith, if negligent, errors. *Id.* at 752. *See also McKesson HBOC, Inc. Securities Litigation*, 126 F.Supp.2d 1248, 1265 (N.D.Cal.2000) (noting that objective falsity is insufficient to state a claim because "the securities laws do not create a general cause of action for negligence by investment advisers.")

■ While plaintiffs do not expressly argue that objective falsity is sufficient, they collapse allegations of the objective wrongness of the opinions with claimed subjective insincerity by arguing that the objective wrongness of the opinions was so

falsehood that might have been available.

obvious that a reasonable person could not have held those opinions, concluding that defendants must have been lying when they published them. There are strong policy reasons why courts do not engage in this kind of second-guessing of forward-looking opinions. Most simply, relying on an inference that an opinion that turned out to have been very misguided must have been subjectively insincere would encourage lawsuits every time a drop in share price proves that an earlier-uttered forward-looking opinion turned out to have been too optimistic. The Second Circuit has firmly rejected this "fraud by hindsight" approach. *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud"); *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994). The securities laws are not intended as investor insurance every time an investment strategy turns out to have been mistaken. *See In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 273 F.Supp.2d 351, 358 (S.D.N.Y.2003) (noting that the securities laws are not meant to underwrite investor risk). Thus, the ultimate inaccuracy of defendants' recommendations cannot be the sole basis for liability in a § 10(b) action for misstatement of opinion. While a jury may consider evidence that an opinion was not soundly based in assessing scienter, such evidence is not sufficient to allege scienter, and assertions that the opinions must have been false because in hindsight it would have been more prudent to make different recommendations do not constitute the required particularized allegations of "provable facts" supporting an inference that the opinions were not truly held.

*Motive*

■ The *Finazzo* and *Podany* plaintiffs also allege that the insincerity of defendants' opinions is evidenced by defendants' motive to lie,[4] which in turn is supported by defendants' failure to disclose Johnson's interest in the target companies prior to the mergers.

The complaints themselves demonstrate, however, that Johnson's interest in the target companies was indeed disclosed by the broad disclaimers in the RS reports stating that "Robertson Stephens, its managing directors, its affiliates, and/or its employees may have an interest in the securities of the issues described and may make purchases or sales while this report is in circulation." (*Finazzo* Am. Compl. ¶ 89.) This language is broad enough to alert investors that the persons drafting the research reports may have had an interest in the issuer being rated, and/or in other companies mentioned in the report such as the targets of proposed mergers with the rated issuer.[5] Of course, disclo-

---

**4.** "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5 that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.'" *Kalnit*, 264 F.3d at 138 (internal quotations omitted). To survive a motion to dismiss, a § 10(b) complaint must "allege facts that give rise to a strong inference of fraudulent intent" by alleging either "(a) ... facts to show that defendants had both motive and opportunity to commit fraud, or (b) ... facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.

1995), quoting *Shields*, 25 F.3d at 1128. *See also In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21219049, at *16–17.

**5.** Plaintiffs may not contend that the disclosure was not adequate because Johnson held stock in the acquisition targets and not in the "issues" of the acquiring companies being assessed in the research reports. The motivation for the alleged frauds is that after the mergers, Johnson *would* hold stock in the acquiring companies, and that he therefore had an interest in keeping the acquiring companies' stock prices high. Accordingly, the

sure of a potential conflict of interest does not completely insulate defendants from allegations that the opinions were fraudulent and motivated by the conflicted interest.[6] However, where a potential conflict of interest is disclosed, the allegation of motive is weaker than where it is not.

The allegations that Johnson owned shares in the target companies could constitute additional evidence for a factfinder considering whether the opinions were sincerely held. However, the existence of motive alone is not a strong indicator of falsity of the opinions,[7] especially where, as here, a disclosure covers exactly the conflict described. Furthermore, the ownership by analysts of stock in the companies they analyzed was a well-known feature of the telecommunications markets, as may be inferred from the disclaimers in the RS reports, which are quoted by plaintiffs. Again, while this does not insulate defendants from allegations of issuing fraudulent opinions, the fact that the motive is common to the industry and specifically disclosed in these cases reduces the weight of motive in establishing the falsity of the opinions.[8]

*Similar Fraudulent Schemes*

Finally, in support of the allegation that defendants issued false statements of opinion concerning Redback and Sycamore stock with intent to defraud, plaintiffs assert that defendants engaged in similar schemes regarding other issuers, particularly the Corvis Corporation. This decision has already referred to the related lawsuit regarding Corvis, in which the plaintiffs alleged that these same defendants knowingly published opinions they did not truly hold in order to artificially inflate the Corvis stock price until they could secretly sell their own Corvis shares. As this Court held in that case, those plaintiffs survived a motion to dismiss because they alleged statements and actions inconsistent with defendants' published opinions about Corvis from which a reasonable factfinder could infer the insincerity of the published opinions. *DeMarco,* 2004 WL 51232, at *4.

While the commission of similar fraudulent schemes may be admissible evidence of defendants' state of mind under Federal Rule of Evidence 404(b), alleging the existence of such *other* schemes does not suffi-

---

allegedly undisclosed interests in the target companies was the economic and moral equivalent of an interest in the acquiring companies, the possibility of which was disclosed.

**6.** *See In re WorldCom, Inc. Sec. Litig.,* 2003 WL 21219049, at *31, quoting *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996) (the "doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")

**7.** As one judge of this court recently noted, "the pleading of a motive to issue false statements does not establish that false statements were in fact issued." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 273 F.Supp.2d 351, 373 (S.D.N.Y.2003).

**8.** Plaintiffs argue that the allegations here are "strikingly similar" to the allegations against research analysts in *In re WorldCom, Inc. Sec. Litig.,* where the complaint alleged that analysts were motivated to publish reports containing false opinions in order to secure lucrative investment banking business from issuers, and where a *quid pro quo* arrangement between the bank and the issuer remained undisclosed. (Finazzo Opp. 16.) However, in that case, Judge Cote found that the plaintiffs alleged the falsity of opinions by "describ[ing] strong circumstantial evidence" that the analyst had learned of WorldCom's falsified financial reports, yet continued to issue positive opinions about WorldCom stock. *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d at 424. Here, in contrast, plaintiffs allege that defendants should have evaluated evidence differently, and not that defendants learned of a fraud and published opinions that covered it up.

ciently plead that the opinions in *these* cases were fraudulent. The PSLRA requires that each separate instance of fraud be pled with particularity. This accords with common sense and fairness, since otherwise one successfully-alleged misstatement of opinion against a given defendant would permit plaintiffs to allege claims for all similar opinions uttered by that defendant, based on allegations that would otherwise be insufficient as to those particular opinions themselves. Robertson Stephens was in the business of publishing opinions about stock purchases, and presumably published opinions about numerous different issuers. Specific allegations of fraud as to any one opinion, although it may raise awareness among potential plaintiffs or spur action by regulatory agencies, is not legally sufficient under § 10(b) to allege fraud as to *all* opinions published by that defendant. To hold otherwise would declare open season on all opinions issued by RS even in the absence of the particularized allegations of fraud required by Fed.R.Civ.P. 9(b) and the PSLRA.

*Summary*

Plaintiffs offer three kinds of evidence in support of the allegations of false opinions regarding Redback and Sycamore stock. First, they allege that, based on the information available at the time, no reasonable person could have held the published opinions. Second, they allege that Johnson had motive to lie because he owned shares in the target companies and stood to gain from the merger if the price of the acquiring companies' stock remained high. While the complaints claim that the interest was undisclosed, the complaints themselves reveal that the disclaimer did indeed reveal the potential conflict of interest. And finally, plaintiffs allege that the defendants had engaged in at least one other, similar scheme concerning another issuer by publishing false opinions in order to artificially inflate share prices.

Taken individually, each of the above elements makes a weak showing from which misstatement of opinion may be inferred: The first, because courts are not in the business of second-guessing forward-looking opinions; particularly in the wild days of the technology stock bubble, opinions that with hindsight might appear reckless often represented the conventional wisdom of Wall Street. The second, because generalized allegations of motive, especially when the alleged conflict is disclosed, are insufficient to allege fraudulent intent; analysts' ownership of the stocks they touted, when disclosed, could constitute evidence of belief in a company's prospects as well as of a motive to inflate the stock's value, particularly when there is no allegation that the stock was profitably "dumped" after the analysts' reports artificially "pumped" its value. And the last, because allegations concerning similar schemes do not allege fraud in a given case with the requisite particularity; alleging fraud in a different transaction does not undercut plaintiffs' obligation to allege provable facts giving rise to an inference of scienter in the transaction at hand. Aggregating these three elements does not solve the plaintiffs' problem in the *Podany* and *Finazzo* cases. While the three kinds of allegations may constitute evidence that a factfinder could consider, the complaints do not allege with particularity provable facts to demonstrate that the opinions about Sycamore and Redback were objectively and subjectively false.

 Unless plaintiffs allege specific facts from which a factfinder can infer that the published opinions in this case were not truly held at the time they were made, they have not met the heightened pleading standard for a misrepresentation of opinion claim under § 10(b). Since the complaints fail to adequately plead falsity of the opinions, the analysis of the claims

under § 10(b) and Rule 10b–5 need proceed no further, and those claims are dismissed. Finally, the claims in both cases against Robertson Stephens for violation of the control person provision of § 20(a) are dismissed because plaintiffs have failed to state a primary violation of the Exchange Act. *See In re Scholastic Corp. Securities Litigation,* 252 F.3d 63, 77–78 (2d Cir.2001).[9]

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the complaints in *Podany* and *Finazzo* are granted.

---

9. Plaintiffs' argument that the allegations on which they rely are sufficient to permit an inference of falsity of the opinions complained of is hardly frivolous, however. Accordingly, the Court finds no basis to conclude that plaintiffs or their attorneys violated their obligations under Fed.R.Civ.P. 11(b). *See* 15 U.S.C. § 78u–4(c)(1) (requiring courts, on termination of private securities actions, to make specific Rule 11 findings); *Rombach v. Chang,* 355 F.3d 164, 178 (2d Cir.2004) (remanding for making of such findings).